**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ANDOR PHARMACEUTICALS, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| | ) | C.A. No.: N22C-06-078-EMD CCLD |
| v. | ) | |
| | ) | |
| LANNETT COMPANY, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

Submitted:  January 17, 2024
Decided: April 15, 2024
*Redacted per Order dated April 29, 2024[1]*

*Upon Plaintiff/Counterclaim Defendant Andor Pharmaceuticals, LLC's
Motion to Dismiss Defendant's Counterclaim*
***GRANTED in part DENIED in part***

Jesse L. Noa, Esquire, P. Andrew Smith, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Scott W. Atherton, Esquire, Terence M. Mullen, Esquire, Atherton Galardi Mullen & Reeder PLLC, West Palm Beach, Florida.  *Attorneys for Plaintiff/Counterclaim Defendant Andor Pharmaceuticals, LLC.*

Brian E. Farnan, Esquire, Michael J. Farnan, Esquire, Farnan LLP, Wilmington, Delaware, Julia Chapman, Esquire, Stefanie A. Tubbs, Esquire, Forrest E. Lovett, Esquire, Dechert LLP, Philadelphia, Pennsylvania.  *Attorneys for Defendant/Counterclaim Plaintiff Lannett Company, Inc.*

**DAVIS, J.**

## I.      INTRODUCTION

This civil action is a breach of contract indemnification claim assigned to the Complex

Commercial Litigation Division of the Court.  Plaintiff/Counterclaim Defendant Andor

Pharmaceuticals, LLC ("Andor") claims Defendant/Counterclaim Plaintiff Lannett Company,

---

[1] D.I. No. 220.

Inc. ("Lannett" or "LCI") is in breach of the parties' license agreement related to the manufacture and sale of generic drug formulations of Concerta®, a medication used to treat attention deficit hyperactivity disorder ("ADHD"). Lannett denies the allegations and asserts counterclaims for reformation based on mistake, declaratory judgment based on frustration of purpose, declaratory judgment based on substantive unconscionability, and unjust enrichment. Presently before the Court is Andor's Motion to Dismiss Defendant's Counterclaims (the "Motion"). The Court heard oral argument on the Motion on January 17, 2024. Afterwards, the Court took the Motion under advisement.

For the reasons set forth below, the Motion is **GRANTED** in part, and **DENIED** in part.

## II. RELEVANT FACTS

### A. PARTIES

Andor is a Delaware Limited Liability Company with a principal place of business in Florida.[2] Andor develops and licenses pharmaceutical products.[3]

Lannett is a Delaware corporation with its principal place of business in Pennsylvania.[4] Lannett is a "provider of . . . generic pharmaceutical products."[5] Lannett was previously publicly traded on the New York Stock Exchange ("NYSE").[6]

---

[2] Andor's Second Amended Complaint (hereinafter "2d Am. Compl.") ¶ 1 (D.I. No. 104).

[3] *Id.*

[4] *Id.* ¶ 2; Lannett's Answer, Affirmative Defenses, and Incorporated Counterclaims to Andor's Second Amended Complaint (hereinafter "Answer") ¶ 2 (D.I. No. 118).

[5] Lannett's Amended Answer to Plaintiff's Amended Complaint, with Affirmative Defenses and Counterclaims (hereinafter "Countercls.") ¶ 10 (D.I. No. 100).

[6] 2d Am. Compl. ¶ 2; Answer ¶ 2. Lannett was delisted in April, 2023 after it "had fallen below the NYSE's continued listing standard requiring listed companies to maintain an average global market capitalization over a consecutive 30 trading day period of at least $15,000,000." (*NYSE to Suspend Trading Immediately in Lannett Company, Inc. (LCI) and Commence Delisting Proceedings*, BUSINESS WIRE (Apr. 19, 2023), https://www.businesswire.com/news/home/20230419005997/en/).

## B. PRODUCT DEVELOPMENT AND RELEVANT NON-PARTIES

Generic drugs contain the same active ingredient(s) as brand-name drugs and are permitted to be sold in the United States after the original drug's patent has expired.[7] Pharmaceutical companies that sell generic drugs must first demonstrate to the U.S. Food and Drug Administration ("FDA") that their product is bioequivalent to the brand-name drug, signifying that the generic drug "works in the same way and provides the same clinical benefit as the brand-name medicine."[8] Pharmaceutical companies do this by filing an Abbreviated New Drug Application ("ANDA") with the FDA.[9] If the FDA approves an ANDA, the FDA then assigns the generic drug a "therapeutic equivalence" rating.[10] The two ratings relevant to this civil action are: "AB" and "BX".

AB-rated drugs are those which "the 'FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products' and for which 'actual and potential bioequivalence problems have been resolved with . . . adequate . . . evidence supporting bioequivalence.'"[11] BX-rated medications are "drug products for which actual or potential bioequivalence problems have not been resolved by adequate evidence of bioequivalence."[12]

Both AB- and BX-rated drugs are FDA-approved and may be prescribed, but only AB-rated products can be automatically substituted by pharmacists when filling prescriptions for a

---

[7] U.S. FOOD & DRUG ADMINISTRATION, *Generic Drugs: Questions and Answers*, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers (last visited Jan. 1, 2024).
[8] *Id.*
[9] *Id.* The application is "abbreviated" because applicants do not have to replicate certain clinical studies required for brand-name drug approval. This is also why generic medications are typically less expensive than their branded counterparts.
[10] Countercls. ¶ 14.
[11] 2d Am. Compl. ¶ 10 (quoting U.S. FOOD & DRUG ADMINISTRATION, APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS, (43d ed. 2023), https://www.fda.gov/media/71474/download) (the "Orange Book").
[12] *Id.* ¶ 11.

brand-name product.[13]  BX-rated drugs must be explicitly prescribed.[14]  Because of the automatic substitution allowed for AB products, these medications "gain significantly more market share than the BX-rated product of the same drug."[15]

### 1. Lannett's Generic Product Development.

Methylphenidate is the active ingredient in certain medications primarily used to treat ADHD.[16]  Methylphenidate is sold under several brand names, including Concerta®.[17]  In 2013, Kremers Urban Development Company ("KUDCO") received an AB-rating for its generic version of Concerta®.[18]  Kremers Urban Pharmaceuticals, Inc. ("KU") then sold Concerta® in the United States.[19]  In 2014, the KU product was reclassified as BX-rated based on updated bioequivalence criteria from the FDA.[20]  KU was acquired by Lannett in 2015, and Lannett continues to distribute the BX-rated product.[21]

In 2016, the FDA "proposed to withdraw the approval of Lannett's BX Product, and proceedings relating to that proposal remain pending."[22]

### 2. Andor's Generic Product Development and Commercial Supply Agreement with Catalent.

Andor began to develop a generic version of Concerta® in 2015, (the "AB Product"), and submitted an ANDA to the FDA.[23]  While that ANDA was pending in 2017, Andor and non-party Catalent Pharma Solutions, LLC, ("Catalent"), a drug manufacturer, entered into a

---

[13] Countercls. ¶¶ 15-16; Plaintiff's Motion to Dismiss Defendant's Counterclaim (hereinafter "Pl. MTD") at 6-7 (D.I. No. 114).
[14] Countercls. ¶ 16.
[15] Id. ¶ 17.
[16] Id. ¶ 20.
[17] Id.
[18] Id. ¶¶ 25-26.
[19] Id. ¶ 27.
[20] Id. ¶¶ 29-30.
[21] Id. ¶¶ 27-28, 36.
[22] Pl. MTD at 7; see also Countercls. ¶¶ 31-35.
[23] Pl. MTD at 7.

Commercial Supply Agreement ("CSA").[24]   The CSA included the following relevant

provisions:

- **[REDACTED PER ORDER]**[25]
- **[REDACTED PER ORDER]**
    - **[REDACTED PER ORDER]**.[26]
    - **[REDACTED PER ORDER]**[27]
- **[REDACTED PER ORDER]**[28]
- **[REDACTED PER ORDER]**[29]

Andor later assigned all rights and obligations under the CSA to Lannett as part of Andor

and Lannett's License Agreement, discussed below.[30]

### C. THE PARTIES' NEGOTIATIONS AND THE LICENSE AGREEMENT

In January 2018, Andor and Lannett began negotiating Lannett's potential acquisition of

Andor's still-pending AB Product ANDA.[31]  Lannett was interested in acquiring an AB-rated

Concerta® generic because its own version had been downgraded to a BX-rated drug, and "[t]he

parties anticipated that eventually the customer base for Lannett's BX-rated product would shift

to the AB-rated product once the latter was approved by the FDA."[32]

On July 30, 2018, the Parties entered into an agreement (the "License Agreement")

granting Lannett the right to distribute the AB Product in the United States upon ANDA

approval.[33]  Additionally, the License Agreement obligated Lannett to fulfill all regulatory

---

[24] *Id.*; 2d Am. Compl. ¶ 18.  *See also* CSA, Ex. 2 to 2d Am. Compl. (D.I. No. 104).

[25] Pl. MTD at 7; Countercls. ¶ 4; CSA § 4.1(A).

[26] Pl. MTD at 7; Countercls. ¶¶ 46-47; CSA § 7.1 (B), Attach. C.

[27] Countercls. ¶ 50; CSA at Attach. C.

[28] CSA § 4.2.  Andor states that its agreement to forego minimum volume requirements "was a term specifically negotiated by Andor and Catalent, and confirmed in an email from Catalent's Business Development Account Executive to Andor: **[REDACTED PER ORDER]**" (2d. Am. Compl. ¶ 18).

[29] *Id.* § 18.1.

[30] Pl. MTD at 8.

[31] *Id.*; Countercls. ¶¶ 54-57.

[32] Countercls. ¶¶ 57-59; Pl. MTD at 7-8.

[33] 2d Am. Compl. ¶¶ 6, 71; Pl. MTD at 8; License Agreement § 1.01(a) (Ex. 1 to D.I. No. 104).  It is unclear at what point negotiations shifted from Lannett's possible acquisition of the AB-rated ANDA to Lannett's ultimately receiving only the right to distribute the drug.

obligations for the then-pending ANDA and its labeling of the AB Product.[34]  Lannett was also obligated to market and sell the AB Product:

> Commercialization; Pricing.
> **[REDACTED PER ORDER]**[35]

The License Agreement is "perpetual in duration and permits termination only in case of material breach by either party" or other limited circumstances.[36]  The License Agreement assigned to Lannett "all of Licensor's rights in and under that certain Manufacturing Agreement with Catalent, Inc. dated June 21, 2017 (the "Catalent Manufacturing Agreement").[37]  Further, the License Agreement included the representation that:

> **[REDACTED PER ORDER]**[38]

The License Agreement also includes royalty obligations that "extend[] in perpetuity":[39]

> Section 1.01(c) Royalty Payments . . .

> **[REDACTED PER ORDER]**

> **[REDACTED PER ORDER]**[40]

On July 31, 2018, the FDA informed Andor that the approval date for the AB Product ANDA would be pushed back from a previously expected tentative date of February 2, 2019 to an undetermined time.[41]  As a result, "there was an increased risk that other generic methylphenidate formulations could be approved and enter the market prior to the" AB Product receiving approval.[42]  Based on concerns that a more crowded market would "driv[e] down the

---

[34] Countercls. ¶¶ 75, 90; License Agreement § 5.05.
[35] License Agreement § 5.02.  **[REDACTED PER ORDER]**
[36] Countercls. § 77; License Agreement § 5.09.
[37] License Agreement § 1.02(d).  The License Agreement refers to the CSA as the "Catalent Manufacturing Agreement" (*see*, *e.g.*, Countercls. at 38, n.4).
[38] License Agreement § 3.04.
[39] Countercls. ¶ 124.
[40] License Agreement § 101(c). **[REDACTED PER ORDER].** (Exs. A-B to License Agreement).
[41] Countercls. ¶¶ 79, 81.
[42] *Id*. ¶ 82.

price Lannett could receive" for the AB Product and thus "increasing the risk that Lannett would not be able to satisfy the License Agreement's royalty payment requirements", the Parties executed an amendment to the License Agreement ("Amendment No. 1") on August 2, 2018.[43]

Amendment No 1. states, in pertinent part:

**[REDACTED PER ORDER]**[44]

The FDA approved the AB Product on April 24, 2019.[45]

Lannett states that "at least three" competing generic drugs "enter[ed] the market during the Delay Period".[46] Andor agrees that other methylphenidate products entered the market at this time, but the parties disagree as to whether this was sufficient to trigger Amendment No. 1.[47]

### D. Lannett and Catalent Enter into an Amended CSA.

During the Delay Period in February 2019, Catalent informed Lannett that it would not adhere to the pricing schedule contained in Attachment C.[48] Catalent then submitted a draft amendment to Attachment C with "substantially higher pricing for each dosage strength of product."[49] Lannett quotes Catalent as stating its price increase was "strictly necessary because of the steep drop in expected demand."[50] Catalent's reason for the increase conflicts with the "inflation-capped and raw material [price] increases provided for" in Attachment C.[51]

---

[43] *Id*. ¶¶ 82, 84.
[44] License Agreement, Amend. No. 1 § 2(a) (emphasis supplied).
[45] 2d Am. Compl. ¶ 13. Accordingly, the Delay Period ran from February 2, 2019 through April 24, 2019 (*see, e.g., id*. ¶ 37).
[46] Countercls. ¶¶ 91-93. The competing generic methylphenidate products were produced by Alvogen, ANI Pharmaceuticals, and Patriot Pharmaceuticals. *Id*.
[47] Pl. MTD at 9-10, n.3. Specifically, Andor contends that no products *both* received regulatory approval *and* were commercially launched during the Delay Period. 2d Am. Compl. ¶¶ 38, 93.
[48] *Id*. at 2, 10; Countercls. ¶¶ 96-97, 101-106.
[49] Countercls. ¶ 101.
[50] *Id*. ¶ 100.
[51] *Id*. ¶ 66.

Lannett claims that, "unbeknownst to Lannett, Catalent had always represented to Andor that it believed it could increase prices and impose minimum order amounts."[52] Lannett alleges that, according to Catalent, "there were side communications between Andor and Catalent suggesting that pricing was subject to volume commitments, minimum purchase requirements, and other potential changes not included in Attachment C."[53]

Lannett quotes from a February 13, 2019 email from Catalent's Vice President of Business Development to Andor representatives:

**[REDACTED PER ORDER]**

**[REDACTED PER ORDER]**[54]

Lannett's general counsel was copied on this e-mail.[55]

Lannett claims that "Andor had never disclosed to Lannett that it had made such minimum volume commitments or price adjustment agreements with Catalent."[56] Lannett also contends that this email was "the first time Lannett heard the pricing in Attachment C was based on minimum volume commitments or that the pricing was going to be adjusted by Catalent."[57]

Nevertheless, Lannett states that that it "negotiated in good faith with Catalent to hold pricing firm, but Catalent refused."[58] Ultimately, Lannett:

> [N]egotiated an Amended CSA with Catalent, pursuant to which [Lannett] agreed to tiered pricing based on volume in exchange for which Catalent agreed to delete the exclusive manufacturer language from the CSA, giving [Lannett] the option to manufacture the AB-Product itself after December 2020, along with other

---

[52] Lannett's Opposition to Andor's Motion to Dismiss Lannett's Counterclaims (hereinafter "Def. Opp'n") at 7 (D.I. No. 135).

[53] Countercls. ¶ 53; Andor responds: "Lannett does not allege that 'side communications' actually happened, much less that they constituted enforceable modifications of the CSA, which clearly provided that '[n]o term of [the CSA] may be amended except upon written agreement of both parties.'" (Pl. MTD at 10) (internal citations omitted).

[54] *Id.* ¶ 97 (emphasis added by Lannett—not in original material quoted).

[55] *Id.*

[56] *Id.* ¶¶ 98-99.

[57] *Id.*

[58] *Id.* ¶ 103.

concessions made by Catalent (such as more favorable "failure to supply" language).[59]

Lannett and Catalent executed the Amended CSA on April 15, 2019.[60] Under the revised terms, Andor notes that "Lannett could still receive the same, or even lower, per unit prices contained in the original CSA if its orders reached certain volume levels."[61] Lannett contends, however, that it was "[u]nable to gain market share due to the competitors who entered the market," and therefore "could not purchase anywhere close to the volume of product required by Catalent (**[REDACTED PER ORDER]**) to obtain the initial pricing Catalent had agreed to— and upon which Lannett had relied when deciding to sign the License Agreement."[62]

## E. Lannett Stops Selling the AB Product.

In January 2020, Lannett informed Andor that it was unable to manufacture the AB Product profitably due to increased costs.[63] Despite "continued requests" that Catalent lower its pricing, Catalent refused and Lannett began exploring moving manufacturing to its own plant in Indiana in 2021.[64]

After learning that FDA approval for the move could require "new, lengthy, and costly bioequivalence studies" costing "hundreds of thousands of dollars and months of time," Lannett decided its only option was to "[c]ease manufacturing and selling the [AB] Product altogether."[65] In January 2022, Lannett informed Andor of its decision to "stop selling the [AB] Product to Lannett customers" and to "stop sending manufacturing orders to Catalent".[66]

---

[59] 2d Am. Compl. ¶ 20. *See* First Amendment to Commercial Supply Agreement (hereinafter "Amended CSA") (Ex. 3 to D.I. No. 104).
[60] Pl. MTD at 10.
[61] *Id.* (internal citations omitted).
[62] Countercls. ¶ 111.
[63] *Id.* ¶ 110.
[64] *Id.* ¶¶ 112-13.
[65] *Id.* ¶¶ 116-18.
[66] *Id.* ¶ 119.

Andor notes that Lannett ceased making royalty payments on the AB Product when it stopped marketing and selling the drug.[67] Notwithstanding this, Andor maintains that Lannett remains obligated under the License Agreement to make royalty payments pursuant to Lannett's continuing sales of the BX Product.[68]

Lannett states that it agreed to pay BX Product royalties "based on the understanding that such payments would be for a limited period and only until customers elected to switch from Lannett's BX-rated product to Andor's AB-rated product . . . ."[69] However, Lannett also notes that the "royalty obligation extends in perpetuity."[70] Andor alleges that Lannett ceased making BX Product royalty payments as of the second quarter of 2023, and "has communicated to Andor that it intends to withhold all future BX Royalty Payments, in violation of the License Agreement."[71]

## F. LITIGATION HISTORY

On June 10, 2022, Andor filed their initial Complaint against Lannett.[72] On August 1, 2022, Lannett filed a Motion to Dismiss.[73] On September 6, 2022, Andor filed an Amended Complaint, asserting claims for relief for Anticipatory Repudiation (Count I), and Declaratory Judgment (Count II), based on allegations that Lannett did not intend to fulfill their royalty payment obligations in violation of the License Agreement, and alleging damages of at least $11 million from unpaid royalty payments.[74]

---

[67] 2d Am. Compl. ¶53.
[68] *Id*. ¶ 66; Pl. MTD at 2.
[69] Countercls. ¶ 60. Andor responds that Lannett's assertion that there was an understanding of a time limitation is "purely conclusory" and "not memorialized in the License Agreement." Pl. MTD at 9, n.2.
[70] *Id*. at 5.
[71] 2d Am. Compl. ¶¶ 67, 72. Andor calculates this payment as $900,899.00, due as of August 15, 2023. *Id*. ¶¶ 69-70.
[72] D.I. No. 1.
[73] D.I. No. 14.
[74] D.I. No. 22.

Lannett filed its Amended Answer to Plaintiff's Amended Complaint with Affirmative Defenses and Counterclaims on September 13, 2023.[75] Lannett asserts the following counterclaims:

- Count I: Reformation of the License Agreement.[76] Lannett seeks reformation based on "Lannett's unilateral mistake, or the parties' mutual mistake" regarding Catalent's refusal to honor the price terms in the original CSA.[77]

- Count II: Declaratory relief based on commercial frustration of purpose.[78]

- Count III: Declaratory relief based on substantive unconscionability.[79]

- Count IV: Unjust enrichment.[80] Lannett seeks restitution in the form of disgorgement of the royalties paid for sales of the BX Product.[81]

Also in September 2023, Andor sought[82] and was granted[83] leave to file its Second Amended Complaint. The Second Amended Complaint was filed on September 22, 2023.[84]

On October 23, 2023, Andor filed the instant Motion to Dismiss Defendant's Counterclaims.[85]

Lannett filed its Answer, Affirmative Defenses, and Incorporated Counterclaims to Andor's Second Amended Complaint on November 1, 2023.[86]

On January 11, 2024, the parties sought leave of the Court to allow Lannett to file its proposed Amended Answer to Plaintiff's Amended Complaint, With Affirmative Defenses and

---

[75] D.I. No. 100.
[76] Countercls. ¶¶ 125-37.
[77] Id.
[78] Id. ¶¶ 138-48.
[79] Id. ¶¶ 149-60.
[80] Id. ¶¶ 161-69.
[81] Id.
[82] D.I. No. 101.
[83] D.I. No. 103.
[84] D.I. No. 104. The Second Amended Complaint was filed after a payment due date passed, rendering a previously stayed issue ripe. See Tr. of Status Conference at 10-13, D.I. No. 109 (Sept. 22, 2023).
[85] D.I. No. 114.
[86] D.I. No. 118. Because the Counterclaims are incorporated from Lannett's Amended Answer to Pl.'s Amended Complaint with Affirmative Defenses and Counterclaims, all citations herein are to that document filed on September 13, 2023 (D.I. No. 100).

Amended Counterclaims.[87]  In their stipulation and proposed order, the parties also agreed,

subject to the Court's approval, "that the amendment does not effect the substance or the

schedule of the  pending motion to dismiss which is set for hearing on January 17, 2024, and that

the motion to dismiss will be deemed directed to the amended counterclaims and the hearing can

proceed as scheduled."[88]

## III.    PARTIES' CONTENTIONS

### A. ANDOR'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

Andor argues that Lannett's counterclaims all "essentially seek" to have the "Court [ ]

rewrite the parties' License Agreement . . . because Lannett claims that it can no longer

profitably sell the licensed product."[89]  Andor claims that Lannett wants the Court to do what

Delaware courts are not supposed to do—rewrite an agreed upon contract that Lannett now sees

as a "bad deal."[90]

Andor maintains that Lannett's claim for reformation of the License Agreement (Count I)

fails for multiple reasons.  First, Andor states that Lannett fails to state a claim for Reformation

because Lannett does not identify with required particularity a prior understanding between "the

Parties that differs materially from the terms of the License Agreement, as required for a

reformation claim."[91]  Next, Andor claims that this count is barred by the doctrine of laches

because Lannett did not file its claim until over four years had elapsed when "Lannett had actual

knowledge of the alleged 'mistake'" at issue.[92]  Finally, Andor contends that Lannett's continued

---

[87] D.I. No. 156.
[88] *Id.*
[89] Pl. MTD at 1.
[90] *Id.* (citing *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)).
[91] *Id.* at 3.
[92] *Id.*

performance under "the License Agreement even after learning of the alleged 'mistake'" constitutes a  ratification which bars the reformation claim.[93]

Andor also moves to dismiss Lannett's claim for declaratory relief due to commercial frustration of purpose (Count II).[94]  Andor notes that Lannett's basis for frustration of purpose is "Catalent's price increases",[95]  and that this "risk of non-performance by a third-party" falls short of the type of "'cataclysmic, wholly unforeseeable' supervening events" that justify the application of the commercial frustration doctrine.[96]  Andor further argues that "Lannett's alleged inability to make a profit" was due to changing market conditions and that this was a risk clearly assumed by Lannett under the contract.[97]  Finally, Andor claims that Lannett's commercial frustration of purpose claim is also barred by the doctrines of laches and ratification.[98]

Andor next argument is that Lannett's substantive unconscionability declaratory judgment claim (Count III) should be dismissed because it does not meet Delaware's pleading requirements for that claim, especially as pled by a "sophisticated corporation."[99]  Andor contends that Lannett's argument here is "essentially" a claim of overpayment for the license of Andor's product, and that "'disputes over price alone' do not render a contract unconscionable."[100]

---

[93] *Id*. at 4.
[94] *Id*.
[95] *Id*. (quoting Countercl. ¶ 145).
[96] *Id*. (quoting *McReynolds v. Trilantic Cap. Partners IV L.P.*, 2010 WL 3721865, at *4 (Del. Ch. Sept. 23, 2010)).
[97] *Id*. at 4-5 (citing *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *40 (Del. Ch. July 9, 2021)).
[98] *Id*. at 27.
[99] *Id*. at 5.
[100] *Id*. at 29 (quoting *FdG Logistics LLC v. A&R Logistics Holdings, Inc*., 131 A.3d 842, 862) (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016)).

Finally, Andor moves to dismiss Lannett's claim for unjust enrichment (Count IV). Andor states that this claim should be dismissed "for the simple reason that Lannett's relationship with Andor is governed by a written contract".[101]

## B. DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS

Lannett opposes the Motion. Lannett argues that its reformation claim (Count I) should stand because it has pled a prior agreement that differed from the License Agreement.[102] Specifically, Lannett claims that "Andor knew (or was at least mutually mistaken as to whether) Catalent might change prices" or impose minimum order amounts despite no mention of these possibilities in the License Agreement or the CSA.[103] Next, Lannett argues that "[w]hether the doctrine of laches applies is a question that is not appropriate for disposition on a motion to dismiss."[104] Lannett also states that Andor has failed to show that Andor was prejudiced by an unreasonable delay, as required for laches to apply.[105]

Similarly, Lannett maintains that the matter of ratification here "is not appropriate for disposition at the motion to dismiss stage" because "ratification of a contract that is properly subject to reformation—a determination that will be made later, after discovery—does not bar reformation."[106] Further, Lannett states that Andor's ratification argument "improperly faults Lannett for trying to mitigate its damages" as required by contract law.[107]

---

[101] *Id*. at 5-6.
[102] Def. Opp'n at 7-8.
[103] *Id*. at 7.
[104] *Id.* at 8.
[105] *Id.* at 9.
[106] *Id.* (citing *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 680 (Del. 2013)).
[107] *Id.* at 9-10 (citing *NorKei Ventures, LLC v. Butler-Gordon, Inc.*, 2008 WL 4152775, at *2 (Del. Super. Aug. 28, 2008) (internal citations omitted)).

14

Lannett provides the claim for declaratory relief based on commercial frustration of purpose (Count II) is adequately pled.[108] Lannett posits that the Court should reject Andor's arguments based on laches and ratification as inappropriate at the motion to dismiss stage.[109] Lannett also rejects Andor's contention that Lannett's "failure to gain market share" should have been foreseeable to Lannett.[110] Instead, Lannett argues that its claim here is based on Catalent's actions, which were not foreseeable to Lannett.[111] Moreover, Lannett argues that the issue of foreseeability "requires a determination based on evidence" and is therefore not appropriately decided on a motion to dismiss.[112] Finally, Lannett contends that the License Agreement was rendered valueless to Lannett, while Andor received a "windfall".[113]

Lannett states that its claim for declaratory relief based on substantive unconscionability (Count III) is more than a "dispute[] over price alone."[114] Lannett argues that the "agreement is based on an inherent imbalance of information between the parties".[115] Lannett maintains that there was a "gross disparity in the parties' rights and obligations" that requires a fact-specific inquiry under an unconscionability analysis.[116] In addition, Lannett contends that its unconscionability claim should not be dismissed before Lannett has the "opportunity to present evidence as to [the contract's] commercial setting, purpose, and effect to aid the court in making the determination."[117]

---

[108] *Id.* at 10.
[109] *Id.*
[110] *Id.* at 10, n.1.
[111] *Id.* at 10-11.
[112] *Id.* at 11.
[113] *Id.* at 11-12.
[114] *Id.* at 12.
[115] *Id.* at 14.
[116] *Id.* at 12-13.
[117] *Id.* at 12 (quoting *James v. Nat'l Fin., LLC*, 132 A.3d 799, 814 (Del. Ch. 2016) (additional internal citations omitted)).

Finally, Lannett provides that its claim for unjust enrichment (Count IV) survives dismissal because Andor incorrectly argues that a contract governs the parties' relationship.[118] Lannett states that because the validity of the License Agreement is at issue, the unjust enrichment claim may proceed.[119] In addition, Lannett notes that Andor was allegedly enriched by the contract at issue, and that "Delaware courts deny motions to dismiss unjust enrichment claims where . . . the contract that purportedly governs the parties' relationship is the precise vehicle that enriched the [opposing party] in the first place."[120]

## IV.    STANDARD OF REVIEW

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[121] However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[122]

---

[118] *Id.* at 14.
[119] *Id.* 15.
[120] *Id.* (citing *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008); *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *16-17 (Del Ch. Mar. 28, 2018); *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980 at *27-28 (Del. Ch. Nov. 26, 2014)).
[121] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[122] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

16

## V. DISCUSSION

### A. COUNT I: REFORMATION BASED ON MISTAKE[123]

The equitable remedy of reformation is "appropriate when the parties mistakenly believed that the written instrument properly memorialized their agreement when, in fact, it did not."[124] A court reforms the written "contract to reflect the definitive agreement reached by the parties. To do so, the court must be presented with clear evidence of the agreement; without this evidence, there would be no standard by which the writing could be reformed."[125] The Supreme Court has recognized "the need for caution before a court will step in to modify the unambiguous terms of a contract" and has therefore required "proof of a specific prior understanding by clear and convincing evidence."[126]

On a motion to dismiss under Rule 12(b)(6), a party seeking reformation based on mistake must allege with particularity:

> (i) that the parties reached a definite agreement before executing the final contract; (ii) that the final contract failed to incorporate the terms of the agreement; (iii) that the parties were similarly mistaken or that [one] knew of [another's] mistake and remained silent; and (iv) the precise mistake the parties made. The requirements are cumulative, and each one must be pled with particularity. Failure to satisfy one requirement is fatal to the claim."[127]

Establishing the first element of a "specific prior understanding" is a threshold issue and a claim for reformation based on mistake fails if a party is unable to do so, "regardless of whether the

---

[123] Reformation is an equitable remedy that the Court may consider as specially designated Vice Chancellor on the Court of Chancery pursuant to Del. Const. Art. IV, § 13(2). See, e.g., *Travelers Indemnity Co. v. North American Phillips Corp.*, 1992 WL 210560, at *2 (Del. Ch. Aug. 26, 1992) ("In Delaware, reformation is available only in the Court of Chancery."). (

[124] *Interim Healthcare, Inc. v. Sherion Corp.*, 2003 WL 22902879, at *7 (Del. Ch. Nov. 19, 2003) (citing 27 WILLISTON ON CONTRACTS § 70:19, at 255 (4th ed. 2003) ("The purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was mutual assent.").

[125] *Id.*

[126] *In re TIBCO Software Inc. S'Holders Litig.*, 2015 WL 6155894, at *20 (Del. Ch. Oct. 20, 2015).

[127] *AECOM v. SCCI Nat'l Holdings, Inc.*, 2023 WL 6294985, at *6 (Del. Ch. Sept. 27, 2023) (internal citations omitted).

17

mistake is mutual or unilateral coupled with knowing silence."[128]  Alleging a "specific prior understanding" is necessary to "tell[] the Court of Chancery exactly what terms to insert in the contract rather than being put in the position of creating a contract for the parties."[129]

### 1. *Lannett fails to state a claim for reformation based on mistake.*

Andor argues that Lannett cannot meet this threshold requirement because "Lannett fails to allege what 'prior understanding' the parties allegedly reached [that] 'differed materially' from the terms of the License Agreement."[130]  Andor contends that the "prior understanding" according to Lannett "was that the parties expected that Catalent would adhere to the CSA and would not try to raise prices or impose minimum volume amounts."[131]  Andor provides that this "prior understanding" is "completely consistent" with the License Agreement, which represented that the CSA was "valid and enforceable and fully assignable".[132]  Andor also claims that the "entire agreement" clause in the License Agreement—requiring written agreement of both parties in order to amend the CSA—similarly aligns with Lannett's understanding.[133]

Therefore, Andor states, "as with the License Agreement, there is no 'mistake' in the CSA that needs to be reformed in order to be consistent with Lannett's 'prior understanding' . . . The CSA expressly prohibited Catalent from unilaterally changing the pricing terms, which is exactly what Lannett 'understood' to be the case when it entered into the License Agreement."[134]

---

[128] *Id*. at *8 (internal citations omitted).
[129] *Id.* at *6.
[130] Pl. MTD at 15.
[131] *Id*. (citing Countercls. ¶¶ 78, 129).  ("Moreover, Lannett utterly fails to allege (with particularity or otherwise) any other 'definitive agreement' that would support the extensive reformation Lannett is seeking in the License Agreement.").
[132] *Id*. (citing License Agreement § 3.04).
[133] Plaintiff's Reply in Support of its Motion to Dismiss (hereinafter "Pl. Reply") at 2-3 (emphasis supplied) D.I. No. 142).
[134] *Id*.

Lannett responds that it has "adequately alleged an understanding based on the CSA that differed from the agreement Andor had made with Catalent, which was required to be transferred to Lannett pursuant to the License Agreement."[135] Lannett further argues that, "[u]nbeknownst to Lannett, Catalent had always represented to Andor that it believed it would increase prices and impose minimum order amounts."[136] Here, Lannett cites the February 2019 email to Andor from Catalent's Vice President of Global Business Development, that stated, in part: "**[REDACTED PER ORDER]**"[137] According to Lannett, "[t]hus, Andor knew (or was at least mutually mistaken as to whether) Catalent might change prices, and there is nothing in the License Agreement or the CSA about Catalent changing prices or imposing minimum order amounts."[138]

Andor notes that "Lannett cites no case law that supports its theory."[139] Andor maintains that it is "unaware of any case law that stands for the proposition than an agreement between the parties (here, the License Agreement) can be reformed by the Court based on a plaintiff's alleged mistake about the terms of a different agreement that the plaintiff was not involved in negotiating (here, the CSA)."[140]

The Court of Chancery has said:

> Reformation is not an equitable license for the Court to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement.[141]

Andor notes that Lannett seeks reformation based not on "any actual mistake contained in the License Agreement or in the CSA, but rather because, six months after the CSA was assigned to

---

[135] Def. Opp'n at 7 (citing Councercls. ¶¶ 126-137).
[136] *Id*. (citing Councercls. ¶¶ 88-89).
[137] *Id*. (citing Countercls. ¶ 97) (emphasis supplied by Lannett; not in original quoted material).
[138] *Id.*
[139] Pl. Reply at 2.
[140] *Id.*
[141] *In re TIBCO,* 2015 WL 6155894, at *13.

Lannett, Catalent took the position that its pricing was subject to adjustment" contrary to the 'clear terms' of the CSA, and that "[n]owhere does Lannett allege that Catalent was correct in that assertion."[142]

Andor observes that the pricing terms "changed because Lannett, for business reasons, chose to negotiate new pricing terms in exchange for eliminating exclusory obligations when confronted with Catalent's after-the-fact request to adjust the pricing terms.[143] Andor claims that this business decision by Lannett "simply does not justify rewriting the License Agreement so as to materially negate Lannett's financial obligations to Andor."[144]

The Court's decision here aligns with that of the Court of Chancery.[145] Lannett has failed to allege a prior agreement that differs materially from the written License Agreement. The Court has no basis on which to reform the License Agreement and Lannett has therefore failed to state a claim for reformation based on mistake. Accordingly, the Court will grant the Motion as to Count I.

### 2. *Alternatively, the reformation claim is barred by laches.*

Even if adequately pled, the Court finds that Count I is barred by the doctrine of laches.[146] "Laches is the equitable analog of a statute of limitations in a law court. It is rooted in the maxim that 'equity aids the vigilant, not those who slumber on their rights.'"[147]

---

[142] Pl. Reply at 3.

[143] *Id.*

[144] *Id.* at 3-4. *See also id.*, quoting *Nemec*, 991 A.2d at 1126 ("As the Delaware Supreme Court has held, courts must not 'rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have a been a bad deal.'") (discussing a claim for breach of the implied covenant of good faith and fair dealing).

[145] *See, e.g.*, *Acme Markets, Inc. v. Oekos Kirkwood, LLC*, 2023 WL 4873317, at *7 (Del. Ch. July 31, 2023):
> A claim for reformation is not viable when supported only by averments that a bad deal was memorialized; the Plaintiff needed—and failed—to support the claim with factual averments demonstrating that the Parties reached a definite agreement different than the one memorialized. Without such, the Plaintiff has failed to plead a reasonably conceivable claim for reformation and Count III should be dismissed.

[146] Pl. MTD at 16.

[147] *Olga J. Nowak Irrevocable Tr. v. Voya Fin., Inc.*, 2022 WL 2359628, at *5 (Del. Ch. June 30, 2022), *aff'd*, 291 A.3d 207 (Del. 2023) (quoting *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2008)).

20

The elements of laches are: "(1) knowledge [by] the claimant; (2) unreasonable delay in bringing the claim; and (3) resulting prejudice to the defendant."[148] "What constitutes unreasonable delay is a question of fact largely dependent upon the particular circumstances."[149] Courts of equity do "not impose a hard and fast rule as to what constitutes laches", however, "although not determinative, statutes of limitations serve to limit the outermost time when a claim may proceed and be timely."[150]

Therefore, "absent tolling, a claim is barred if the analogous statute of limitations has passed."[151] This is because "a filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches . . . and prejudice to defendants is thus presumed."[152] However:

> Because the Court generally is limited to the facts appearing on the face of the pleadings in ruling on a motion to dismiss, affirmative defenses, such as laches, are not ordinarily well-suited for disposition on such a motion. Thus, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate."[153]

The analogous statute of limitations for a reformation claim is the three-year statute for breach of contract.[154] "The law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs."[155] Because Lannett's reformation claim is based on mistake, Andor argues that the claim "accrues when the claimant discovered or becomes aware of his mistake about the

---

[148] *Id.*

[149] *Whittington v. Dragon Group, L.L.C.*, 991 A.2d 1, 9 (Del. 2009).

[150] *Voya*, 2022 WL 2359628, at *5.

[151] *Id.*

[152] *Whittington*, 991 A.2d at 9; *see also Kim v. Coupang, LLC*, 2021 WL 3671136, at *3 (Del. Ch. Aug. 19, 2021) ("[A] filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches . . . and prejudice to defendants is thus presumed.").

[153] *Perlman v. Vox Media, Inc.*, 2015 WL 5724838, at *12 (Del. Ch. Sept. 30, 2015) (internal citations omitted).

[154] *Voya*, 2022 WL 2359628, at *6 ("It also is uncontroverted that Levey's claim sounds in contract, and that the analogous statute of limitations is 10 *Del. C.* § 8106, under which a breach of contract action must be brought within three years from the date that the cause of action accrued.").

[155] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *18 (Del. Ch. June 29, 2005) (internal citations omitted).

contract."[156] Andor contends that "Lannett had 'actual knowledge' of the facts giving rise to its reformation count in February 2019 when Catalent informed Lannett that it believed it was free to make adjustments to the pricing in the CSA"[157] or "at the very latest in April 2019" when Lannett and Catalent entered into the Amended CSA.[158]

Lannett responds with two arguments: (i) the existence of laches is "fact-based" and therefore should not be decided on a motion to dismiss; and (ii) Andor has failed to demonstrate that it was "prejudiced by an unreasonable delay."[159] Lannett relies on *Solak v. Sarowitz* for the proposition that "[w]hether the doctrine of laches applies is a question that is not appropriate for disposition on a motion to dismiss."[160]

Andor notes that *Solak* also "recognizes that applicability of a laches defense can be decided on a motion to dismiss if 'it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it.'"[161] Andor further cites "numerous examples where courts have found it appropriate to dismiss claims at the pleading stage based on the application of the laches defense."[162] These include *Voya*, in which a motion to dismiss was granted where: "(i) the complaint alleged facts demonstrating when the plaintiff became aware of the alleged 'mistake,' and (ii) the plaintiff filed its claim after expiration of the analogous three-year statute of limitations, without pleading any basis for tolling."[163]

---

[156] Pl. MTD at 17-18 (citing *Voya*, 2022 WL 2359628, at *6-8).
[157] Pl. Reply at 6, n.7 (quoting *In re Coca-Cola Enterprises, Inc.*, 2007 WL 3122370, at *6 (Del. Ch. Oct. 17, 2007) ("[N]either equitable tolling nor any other theory can toll the statute of limitations beyond the point at which the plaintiff had actual knowledge or should have been aware of the facts giving rise to the wrong.").
[158] Pl. MTD at 18.
[159] Def. Opp'n at 8-9 (quoting *Reid*, 970 A.3d at 182).
[160] *Id*. at 8 (quoting *Solak v. Sarowitz*, 153 A.3d 729, 746 (Del. Ch. 2016)).
[161] Pl. Reply at 5, n.5 (quoting *Solak*, 153 A.3d at 746). *See also Kahn v. Seaboard Corp*., 625 A.2d 269, 277 (Del. Ch. 1993) ("[I]t is equally well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by defendants' motion to dismiss.")).
[162] *Id*. at 5-6.
[163] *Id*. at 6 (citing *Voya* 2022 WL 2359628, at *6-8).

Andor argues that, like *Voya*, "the pleading here leaves no doubt that Lannett became aware of the alleged mistake by no later than [April] 2019, and that the analogous statute of limitations expired long before Lannett commenced its reformation counterclaim."[164] Andor contends that the "exception" to a laches defense surviving a motion to dismiss applies here—it is clear from the face of the complaint that Lannett cannot claim an accrual date inside of the three-year statute of limitations.[165]

Lannett also cites to *Reid v. Spazio* and argues that "Andor must show that it was *prejudiced by an unreasonable* delay" for laches to apply.[166] Lannett claims that Andor has failed to do so, and that "Delaware courts reject laches arguments on that basis."[167]

Andor again relies on *Voya* and notes that there is a "presumption of prejudice and unreasonableness when the analogous statute of limitations is exceeded."[168] Andor argues that *Reid* "is inapposite because that case did *not* involve circumstances where the plaintiff filed its claims *after* the expiration of the analogous limitations period."[169] Therefore, Andor states, the *Reid* court was not faced with a presumption of prejudice and instead decided the claim based on "whether 'unusual conditions or extraordinary circumstances' existed.'"[170]

The Court finds that Lannett's reformation claim is barred by laches. The Court looks to the allegations in Lannett's counterclaim. The Court notes that Lannett alleges it learned of the "mistake" no later than April 2019, but did not file its counterclaims until September 2023, after the analogous three-year statute of limitations period for breach of contract had run.

---

[164] *Id.*
[165] *Id.*
[166] Def. Opp'n at 9 (citing *Reid*, 970 A.2d 176, 182) (emphasis supplied).
[167] *Id.* (citing *Collins v. Burke*, 418 A.2d 999, 1003 (Del. 1980) ("[I]n the absence of any showing that appellants suffered a detrimental change of position as a result of the delay, the [reformation] action will not be barred by laches.").
[168] Pl. Reply at 7 (quoting *Voya,* 2022 WL 2359628, at *9).
[169] *Id.* (emphasis supplied).
[170] *Id.* (quoting *Reid*, 970 A.2d at 183).

Consequently, prejudice to Andor is presumed and the elements of laches are satisfied. Even drawing all inferences in favor of Lannett, on the face of the pleadings, there are no reasonably conceivable set of circumstances under which laches would not bar its reformation claim. Accordingly, the claim should be dismissed.

### 3. *The reformation claim is also barred by ratification.*

Finally, the Court finds that, even if Lannett had stated a claim for reformation and it was not barred by laches, it would be barred by ratification.[171]

"Ratification is an equitable defense that precludes a party who [has] accept[ed] the benefits of a transaction from thereafter attacking it. Ratification may be either express or implied through a party's conduct, but it is always a voluntary and positive act."[172] Conduct implying ratification "is such as reasonably to warrant the conclusion that [the ratifying party] has accepted or adopted it, [and] his ratification is implied through his acquiescence."[173] Such conduct "can be rationally explained only if there were an election to treat a supposedly unauthorized act as in fact authorized."[174] Ratification will "not preclude reformation unless the ratifying party actually knew of the error."[175] This is because "a party seeking reformation by definition admits that had he read the document more carefully, he would have noticed and corrected the mistake. . . . [R]equiring actual knowledge recognizes that a party otherwise entitled to equitable reformation based on mistake nearly always could have discovered" that mistake.[176]

---

[171] Pl. MTD at 27.
[172] *Genger v. TR Invs., LLC*, 26 A.3d 180, 195 (Del. 2011) (internal citations omitted).
[173] *Id.*
[174] *Id.*
[175] *Scion*, 68 A.3d at 680-81.
[176] *Id.*

Lannett argues that ratification, like laches, "is not appropriate for disposition at the motion to dismiss stage."[177] Lannett states that "ratification of a contract that is properly subject to reformation—a determination that will be made later, after discovery—does not bar reformation."[178] However, Lannett's interpretation of its supporting case law fails to address that "ratification can be raised as a defense to a claim for reformation, provided that the plaintiff had 'actual knowledge of the error' prior to engaging in the acts by which it ratified the contract."[179]

Andor argues that "Lannett had actual knowledge of the alleged basis for its reformation claim by February 2019 [when Lannett learned Catalent would not honor the CSA's pricing terms], after which Lannett ratified the License Agreement by continuing to perform."[180] Further, Andor reiterates that ratification, like laches and other affirmative defenses, "can be resolved on a motion to dismiss if 'it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it.'"[181]

Lannett attempts to characterize its continued performance under the License Agreement despite the "mistake" as an attempt to mitigate its damages, "which is a duty under contract law."[182] To the Court, however, it is unclear how this precludes a ratification argument. Because Lannett had "actual knowledge of the error" and continued to perform, the ratification argument may be decided at the pleading stage.

Lannett's actions after learning that Catalent would not honor the original pricing terms can only "reasonably warrant the conclusion that" Lannett had acquiesced to the "unauthorized

[177] Def. Opp'n at 9 (citing *J & G Assoc. v. Ritz Camera Ctrs., Inc*., 1989 WL 115216, at *5 (Del. Ch. Oct. 3, 1989)).
[178] *Id.* (citing *Scion*, 68 A.3d at 680-81).
[179] Pl. Reply at 8 (citing *Scion,* 68 A.3d at 681).
[180] Pl. Reply at 8.
[181] Pl. Reply at 8 (quoting *Solak*, 153 A.3d at 746).
[182] Def. Opp'n at 9 (citing *NorKei Ventures, LLC v. Butler-Gordon, Inc.*, 2008 WL 4152775, at *2 (Del. Super. Aug. 28, 2008)).

act."[183]  Moreover, "rather than try to reform or rescind the agreement" when Lannett learned of Catalent's intentions, "Lannett negotiated an Amended CSA with Catalent and moved forward with selling the AB Product in accordance with the License Agreement."[184]  This conduct "can be rationally explained only if there were an election to treat a supposedly unauthorized act as in fact authorized."[185]

Given the allegations in Lannett's counterclaims, the reformation claim is barred by ratification.  For this additional reason, the Court will grant the Motion as to Count I.

## B.  COUNT II: FRUSTRATION OF PURPOSE

Andor seeks dismissal of Lannett's claim for frustration of purpose (Count II)  Andor contends that Lannett fails to state a claim for frustration of purpose and that, even if Lannett did state its claim, it is nevertheless barred by laches and ratification.

### 1.  *Lannett fails to state a claim for frustration of purpose.*

A contracting party's obligations may be discharged by the frustration of purpose doctrine when "his 'principal purpose is substantially frustrated without his fault by the occurrence of any event the non-occurrence of which was a basic assumption on which the contract was made.'"[186]  The doctrine is "very difficult to invoke"[187] and "is generally limited to cases where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party."[188]  "It is not enough that the transaction has become less profitable for the affected

---

[183] *Genger v. TR Invs., LLC*, 26 A.3d 180, 195 (Del. 2011) (internal citations omitted).
[184] Pl. MTD at 20.
[185] *Genger v. TR Invs., LLC*, 26 A.3d 180, 195 (Del. 2011) (internal citations omitted).
[186] *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *40 (Del. Ch. July 9, 2021) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006)).
[187] *Promise Easy Ltd. v. Moon*, 2023 WL 5152173, at *19 (Del. Ch. Aug. 10, 2023) (internal citations omitted).
[188] *McReynolds,* 2010 WL 3721865, at *4 (internal citation omitted).

party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract."[189]

Andor argues that Lannett "fails to allege any basis" for the frustration of purpose doctrine to apply, and therefore fails to state a claim.[190]  Specifically, Andor states that Lannett cannot establish that the "event" at issue—Catalent's alleged refusal to honor the original pricing terms—was "wholly unforeseeable" or that it "render[ed] the contract valueless to one party." [191]  Andor provides  that, "[a]t most, Lannett alleges that it 'had no reason to anticipate that Catalent would refuse to adhere to the terms of the CSA.'  But that does not mean that it was an unforeseeable event that Lannett could not have contracted against."[192]  Andor maintains that Catalent's exclusive manufacturing rights under the CSA carried risks of the type that "any sophisticated party would recognize" are "always . . . associated with relying on a third party to exclusively manufacture the product—for example, the risk of bankruptcy, the risk of poor quality, or the risk of breach or non-performance."[193]

Lannett responds that Andor's "argument runs counter to basic contractual principles on which Delaware courts rely."[194]  Lannett invokes the implied duty of good faith and fair dealing, which "applies to every contract, rendering breach of contract essentially unforeseeable."[195]  The case Lannett relies on, however, also provides that the implied covenant "is not an exception to the rule that courts will not alter the terms of a bargain sophisticated parties entered into

---

[189] *Bardy Diagnostics,* 2021 WL 2886188, at *40 (quoting RESTATEMENT (SECOND) OF CONTS § 265 cmt. a. (AM. LAW INST. 1981)).
[190] Pl. MTD at 22.
[191] *Id.* at 9, 25.
[192] *Id*. at 23-24 (quoting Countercls. ¶ 143).
[193] *Id.* at 24 (citing *Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *7 (Del. Super. Apr. 26, 2019)) ("[H]olding that 'sophisticated parties experienced in their industry' assumed the risk of contract terms that 'subject[ed] one party to the discretion, satisfaction, or decision of . . . a third-party.'").
[194] Def. Opp'n at 10-11.
[195] *Id*. (citing *All. Data Sys. Corp. v. Blackstone Cap. Partners V L.P.*, 963 A.2d 746 (Del. Ch.) (*aff'd*, 976 A.2d 170 (Del. 2009)).

willingly because a party now regrets the deal."[196] Therefore, the covenant "only applies where a contract lacks specific language governing an issue . . . ."[197] Moreover, it appears that Catalent's refusal to adhere to the original CSA was not unforeseeable. As such, Catalent's refusal cannot form a basis for commercial frustration.[198]

Lannett argues that a foreseeability analysis "requires a determination based on evidence" and should therefore survive a motion to dismiss.[199] However, the Court does not believe the cited case law supports this argument.

In *J & G Assoc. v. Ritz Camera Ctrs., Inc.*, the Court of Chancery analyzed a motion to dismiss a commercial impracticability claim, among others.[200] In contrast to frustration of purpose:

> Commercial impracticability applies when: (1) an event occurs that the parties assumed would not happen; (2) continued performance is not commercially practicable; and (3) the party asserting the defense . . . did not expressly or impliedly agree to performance in spite of impracticability.[201]

In *J & G*, the Court declined to dismiss where it was "unable to construe [the disputed contractual provision] without the benefit of evidence as to the parties' intentions and surrounding circumstances" and would have to "await a more developed record."[202]

*J & G* does not discuss foreseeability on the page Lannett cites or otherwise. As quoted, the case does address the intent of contracting parties about a "basic assumption," which is a

---

[196] *All. Data,* 963 A.2d at 770.
[197] *Id*.
[198] Pl. MTD at 24 (citing *McReynolds,* 2010 WL 3721865, at *6 ("It does not frustrate the purpose of a contract for events to play out as contracting parties envisioned, even low-probability events that no one thought actually would come to pass.").
[199] Def. Opp'n at 11 (*citing J & G Assoc. v. Ritz Camera Ctrs., Inc.,* 1989 WL 115216, at * 4 (Del. Ch. Oct. 3, 1989)).
[200] 1989 WL 115216 (Del. Ch. Oct. 3, 1989).
[201] *CRS Proppants LLC v. Preferred Resin Holding Co., LLC*, 2016 WL 6094167, at *6 (Del. Super. Sept. 27, 2016) (internal citation omitted).
[202] *Id*. at 5.

term Lannett uses multiple times in its counterclaim regarding frustration of purpose.[203] Indeed, Lannett's counterclaim here reads more like a claim for commercial impracticability, invoking the factors of that defense.[204]

The Court inquired as to this point at the hearing. The Court wondered whether Lannett should reframe its claim as one for commercial impracticability rather than frustration of purpose, or to plead both in the alternative.[205] The Court did this because an impracticability argument may better fit Lannett's circumstances:

> The doctrine of commercial frustration and impracticability both concern the effect of supervening circumstances upon the rights and duties of the parties; however, with commercial frustration, performance remains possible, but the expected value of performance to the party seeking to be excused has been destroyed by the fortuitous event which supervened to cause an actual, but not literal, failure of consideration.[206]

As the record stands, however, Lannett cannot support its contention that foreseeability is not properly decided on a motion to dismiss a frustration of purpose claim.

Addressing the "rendered valueless" requirement, Andor states that "Lannett's failure to profitably sell the AB Product was due to Lannett's 'inability to gain market share,' not the amended contract terms it agreed to with Catalent[.]"[207] Andor contends that, even though

---

[203] *See* Countercls. ¶¶ 139, 141-145.

[204] *See, e.g.*, *id.* ¶¶ 142, 147:
Specifically, Catalent's nearly 100% increase to the pricing set forth on Attachment C of the CSA prior to commercial launch disrupted the basic assumption upon which the License Agreement was executed (to generate profits and pay royalties), making Lannett's performance of the License Agreement commercially impracticable. . . . Lannett did not agree to perform under the License Agreement in spite of the impracticability . . . .

[205] The doctrines are similar but not identical. *See, e.g.*, Farshad Ghodoosi, *Contracting Risks*, 2022 U. ILL. L. REV. 805, 819 (2022): "[T]he center of the inquiry rests on parties' expectations (basic assumption) regardless of whether performance is impossible (impossibility doctrine), excessively costly (impracticability), or fundamentally different from the original objective (frustration of purpose)."

[206] *Frustration of purpose as pertinent to impracticability*, 30 WILLISTON ON CONTRACTS § 77:94 (4th ed.).

[207] Pl. MTD at 25. *See also id.* at 25-16 (noting that Lannett "chose to negotiate and agree to the new price schedule in the Amended CSA" under which "[t]he original per unit prices were *still available* to Lannett . . . so long as Lannett reached certain volume requirements." And that Lannett failed to reach those volume requirements "[b]ecause of its inability to gain market share.") (emphasis supplied).

Lannett's failure to gain market share "resulted in lower volume orders, which in turn resulted in paying higher per unit prices to Catalent . . . Lannett still made a net profit on the AB Product sales, evidenced by the fact that it was able to pay royalties (50% of its net profits) on the sale of the AB Product to Andor through March 21, 2023."[208]  Andor argues that "the License still had some value to Lannett even after Catalent's alleged refusal to comply with the CSA" and therefore "Lannett's claim of commercial frustration fails."[209]

Lannett responds that the License Agreement was rendered valueless from Lannett's perspective, "costing Lannett $6.25 million in royalties to Andor for a so-called 'inferior' product that Andor did nothing to develop, manufacture, or market."[210]  Lannett's statement does not address whether the cause of this loss of value is the "wholly unforeseeable event" that it cites (Catalent's price changes), or if it is changed market conditions, as Andor argues.

The Court finds that Count II fails to provide a "reasonably plausible set of circumstances" under which it could recover for frustration of purpose.  The risk of a third party failing to abide by contract terms does not appear to "be so severe that it is not fairly to be regarded as within the risks" a party to a contract assumes.[211]  The Court will grant the Motion as to Count II but will allow Lannett thirty days from the date of this decision to amend in an attempt to state a claim for commercial impracticability.

### 2. *The frustration of purpose claim is barred by laches and ratification.*

The parties' arguments here are identical to those regarding laches and ratification.  As with that claim, the Court finds that the claim for frustration of purpose is barred by doctrines of laches and ratification.

---

[208] Pl. Reply at 10 (citing Countercls. ¶¶ 73, 106-111, 122, 139).
[209] *Id.* (internal citation omitted).
[210] Def. Opp'n at 11-12 (internal citations to Countercls. omitted).
[211] *Bardy*, 2021 WL 2886188, at *40.

## C. COUNT III: SUBSTANTIVE UNCONSCIONABILITY

Under Delaware law, an unconscionable contract is one that "no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other."[212] The doctrine is "sparingly used" and requires a finding that "the party with superior bargaining power used it to take unfair advantage of its weaker counterpart. For a contract clause to be unconscionable, its terms must be so one-sided as to be oppressive."[213] "A mere disparity in the bargaining power of parties to a contract will not support a finding of unconscionability."[214] Courts recognize "that 'the parties' 'bargaining power will rarely be equal'" and "are particularly reluctant to apply the doctrine in favor of sophisticated corporations."[215]

Lannett's claim for substantive unconscionability is premised on "a gross disparity exchanged by the parties under the License Agreement."[216] Lannett argues that its royalty obligations are "so one-sided that the License Agreement is oppressive" and that "[t]he Court should thus deem the License Agreement substantively unconscionable and thus unenforceable as of January 2022, when Lannett informed Andor it could no longer perform."[217]

Andor asserts that "Lannett, clearly a 'sophisticated corporation,' makes no effort to allege that it lacked meaningful choice to accept or reject the License Agreement."[218] Andor notes that "even if it is assumed that Lannett overpaid for the license to sell the AB Product by

---

[212] *FdG Logistics,* 131 A.3d at 862 (internal citation omitted).
[213] *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *11 (Del. Ch. July 9, 2002) (internal citation omitted).
[214] *Id.* at *2, 11 (internal citation omitted).
[215] *Id.* at *11 (quoting FARNSWORTH ON CONTRACTS § 4.28 (2d ed. 2000)).
[216] Countercls. ¶ 150.
[217] *Id.* ¶¶ 157, 160.
[218] Pl. MTD at 29 (citing *FdG Logistics,* 131 A.3d at 862 (internal citation omitted)) ("It is not alleged, nor would it be credible to suggest, that the [plaintiff] wielded such overwhelming bargaining power as to present [defendant] with an absence of meaningful choice.").

agreeing to make perpetual royalty payments on the separate BX Product, 'disputes over price alone' do not render a contract unconscionable."[219]

Lannett responds by claiming that the conditions to which it agreed—"to pay royalties on the [BX] Product in perpetuity and regardless of the success or failure of the [AB] Product"— was "based on an inherent imbalance of information between the parties".[220] Lannett alleges that "Andor knew Catalent might change its pricing, but kept that information from Lannett" and that Andor therefore took advantage of Lannett.[221] Lannett argues that, in addition to its perpetual royalty obligations under the License Agreement, the Royalty Guaranty's requirement of a $16 million payment "*no matter what*" constituted "an imbalance in the rights and obligations imposed by the License Agreement."[222] Finally, Lannett asserts that its claim should survive a motion to dismiss because "Lannett must 'be afforded a reasonable opportunity to present evidence as to [the contract's] commercial setting, purpose, and effect to aid the court in making the determination.'"[223]

The Court finds that, at this stage of the proceedings, Lannett alleges a viable claim for substantive unconscionability. Although unconscionability is difficult to prove at trial, at the pleading stage, Lannett's allegation that Andor knew, and did not disclose, that Catalent might change its pricing based on minimum volume requirements suggests a "reasonably conceivable

---

[219] Pl. MTD at 29 (quoting *FdG Logistics* 131 A.3d at 862).

[220] Def. Opp'n at 14.

[221] *Id.*

[222] *Id.* at 13 (internal citations omitted) (emphasis supplied).

[223] *Id.* at 12, citing *James*, 132 A.3d at 814 (quoting 6 *Del. C.* § 2-302 and noting that Delaware courts have applied this provision beyond the sale of goods). Andor replies that *James* "simply does not stand for that proposition." (Pl. Reply at 12). Rather, Andor states:

> In the *James* case, while discussing the unconscionability doctrine, the Court merely made reference to a section of the UCC, which provides: "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

*Id.*, n.9 (quoting *James*, 132 A.3d at 814 (quoting 6 Del. C. § 2–302)).

set of circumstances" under which Lannett might recover on this claim.[224]  On its face, Lannett's claim is more than a "dispute over price" and should not be dismissed.  As such, the Motion, as to Count III, is denied.

### D.  COUNT IV:  UNJUST ENRICHMENT

Unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[225]  The elements of an unjust enrichment claim in Delaware are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[226]  Because of the requirement of an absence of a legal remedy, "[u]njust enrichment is a legal, not equitable, 'off-the-contract theory of recovery' that affords relief when there is no formal agreement."[227]  Therefore, claims of unjust enrichment will typically be dismissed if "the complaint alleges an express, enforceable contract that controls the parties' relationship".[228]

However, Delaware law recognizes two limited exceptions where an unjust enrichment claim based on a written agreement may survive a motion to dismiss.  One exception applies when "the validity of the contract is in doubt or uncertain."[229]  However, it "is insufficient to

---

[224] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe,* 2010 WL 5825343, at *3.

[225] *In re Verizon Ins. Coverage Appeals*, 222 A.2d 566, 577 (Del. 2019) (internal citations omitted).

[226] *Nemec,* 991 A.2d at 1130.

[227] *Aureus Holdings, LLC v. Kubient, Inc*., 2021 WL 3465050, at *4 (Del. Super. Aug. 6, 2021) (quoting *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 496-97 (Del. 2003)).

[228] *Bakerman v. Sidney Frank Importing Co*., 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (internal citations omitted).  *See also BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp*., 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009) ("If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied.").

[229] *Id.; accord Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at * 27 (Del. Ch. Nov. 26, 2014).

state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted."[230]  The second exception occurs:

> [W]hen a plaintiff alleges that it is the [contract], itself, that is the unjust enrichment, the existence of the contract does not bar the unjust enrichment claim. In other words, the contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract.[231]

Andor argues that neither exception applies and Lannett's claim should be dismissed because the parties' relationship is governed by the License Agreement.[232]  Andor contends that "Lannett does not challenge the validity or existence of the License Agreement.  To the contrary, Lannett expressly affirms its existence."[233]

Lannett replies that Andor's statement is "misleading, for Lannett alleges the License Agreement is *unenforceable*, not that it never existed."[234]

Both parties emphasize the same paragraph in Lannett's prayer for relief for substantive unconscionability in support of their arguments here: "The Court should thus deem the License Agreement substantively unconscionable and thus unenforceable as of January 2022, when Lannett informed Andor it could no longer perform."[235]

Andor asserts that this paragraph "expressly acknowledges that the License Agreement *was* a valid, enforceable contract from its inception in July 2018 through January 2022.

---

[230] *Albert,* 2005 WL 2130607, at * 8 ("It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.").

[231] *LVI Grp,* 2018 WL 1559936, at *16 (internal citations omitted).  *See also McPadden,* 964 A.2d at 1276 (plaintiff's unjust enrichment claim survived a motion to dismiss when defendants "wholly failed to satisfy their burden to justify dismissal" where "[d]efendants' sole argument is that an unjust enrichment claim cannot lie . . . because the parties' rights are governed by a contract . . . .").

[232] Pl. MTD at 32.

[233] *Id*. (citing *Albert,* 2005 WL 2130607, at * 8.  Lannett replies: "Andor's assertion that 'Lannett expressly affirms [the] existence' of the License Agreement is misleading, for Lannett alleges the License Agreement is *unenforceable*, not that it never existed.  See, e.g., Countercls. ¶ 160."  (Def. Opp'n at 15) (emphasis supplied).

[234] Def. Opp'n at 15 (emphasis supplied).

[235] Countercls. ¶ 160.

Nowhere in the Count IV does Lannett seek to rescind the License Agreement or have it declared void *ab initio*."[236]

Lannett argues that "[t]he License Agreement *itself* is what unjustly enriched Andor. Delaware courts deny motions to dismiss unjust enrichment claims where, as here, the contract that purportedly governs the parties' relationship is the precise vehicle that enriched the defendant in the first place."[237]

Andor responds that "any contention by Lannett that this claim is based on 'mistake' should be rejected because, as described above with respect to the reformation claim, Lannett fails to allege that the License Agreement arose from 'mistake.'"[238] Andor is correct that Lannett has not adequately argued a claim for reformation based on mistake because Lannett is unable to allege a materially different prior understanding of the parties, as discussed above. Still, the allegation *is* sufficient to preserve a claim for unjust enrichment from dismissal because it is precisely the type of "wrongdoing" that Delaware courts acknowledge under this second exception.[239]

Andor's arguments are persuasive. However, the Court finds that Lannett's reliance on the second exception preserves its claim for unjust enrichment. The Court denies the Motion as to Count IV.

## VI.    CONCLUSION

Now, therefore, it is ordered that the Motion is **GRANTED** as to Counts I and II, and **DENIED** as to Counts III and IV**.**

---

[236] Pl. Reply at 14-15 (emphasis supplied).
[237] Def. Opp'n at 15 (internal citation omitted) (emphasis supplied) (citing *McPadden,* 964 A.2d at 1276).
[238] Pl. MTD at 33.
[239] *See LVI*, 2018 WL 1559936, at *16.

If it so chooses, Lannett has thirty days from the date of this decision to amend its Motion as to Count II so as to state a claim for commercial impracticability.

**IT IS SO ORDERED.**

April 15, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeXpress